The Honorable Thomas S. Zilly

FILED ____ ENTERED
LODGED ____ RECEIVED

JAN 04 2017

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LOBSANG DARGEY,<br><br>Defendant. | NO. CR17-001TSZ<br><br>**PLEA AGREEMENT** |

The United States of America, by and through Annette L. Hayes, United States Attorney for the Western District of Washington, and Justin W. Arnold and Seth Wilkinson, Assistant United States Attorneys, Lobsang Dargey and his attorney, Robert Mahler, enter into the following Agreement, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B):

1. **Waiver of Indictment**. Defendant, having been advised of the right to be charged by Indictment, agrees to waive that right and enter a plea of guilty to the charges brought by the United States Attorney in an Information.

2. **The Charges**. Defendant, having been advised of the right to have this matter tried before a jury, agrees to waive that right and enters pleas of guilty to the following charges contained in the Information.

a. Conspiracy to Commit Wire Fraud, as charged in Count 1, in violation of Title 18, United States Code, Section 371; and

b. Scheme to Conceal Information From the United States, as charged in Count 2, in violation of Title 18, United States Code, Section 1001(a)(1).

By entering pleas of guilty, Defendant hereby waives all objections to the form of the charging document. Defendant further understands that before entering his guilty pleas, he will be placed under oath. Any statement given by Defendant under oath may be used by the United States in a prosecution for perjury or false statement.

3. **Elements of the Offense.** The elements of the offenses to which Defendant is pleading guilty are as follows:

a. The elements of Conspiracy to Commit Wire Fraud, as charged in Count 1, in violation of Title 18, United States Code, Section 371, are as follows:

*First*, there was an agreement between two or more persons to commit the crime of wire fraud;

*Second*, the defendant became a member of the conspiracy knowing of its object and intending to help accomplish it;

*Third*, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

b. The elements of Scheme to Conceal Information From the United States, as charged in Count 2, in violation of Title 18, United States Code, Section 1001(a)(1) are as follows:

*First*, the defendant falsified, concealed, or covered up, by any trick, scheme, artifice, and device, facts within the jurisdiction of the Department of Homeland Security and the United States Citizenship and Immigration Services;

*Second*, the defendant acted willfully; that is, the defendant acted deliberately and with knowledge that he was falsifying, concealing, or covering up the facts by any trick, scheme, artifice, and device, and that his conduct was unlawful; and

*Third*, the facts were material to the activities or decisions of the Department of Homeland Security and United States Citizenship and Immigration Services; that is, the facts had a natural tendency to influence, or were capable of influencing, the agency's decisions or activities.

4.      **The Penalties.** Defendant understands that the statutory penalties applicable to the offenses to which he is pleading guilty are as follows:

   a.     For the offense of Conspiracy to Commit Wire Fraud, as charged in Count 1: A maximum term of imprisonment of five (5) years, a fine of up to two hundred fifty thousand dollars ($250,000) or twice the gross pecuniary gain to the defendant or the gross pecuniary loss to the victims of the offense, a period of supervision following release from prison of up to three (3) years, and a mandatory special assessment of one hundred dollars ($100).

   b.     For the offense of Scheme to Conceal Information From the United States, as charged in Count 2: A maximum term of imprisonment of five (5) years, a fine of up to two hundred fifty thousand dollars ($250,000), a period of supervision following release from prison of up to three (3) years, and a mandatory special assessment of one hundred dollars ($100).

Defendant understands that the Court may order that the terms of imprisonment for Counts 1 and 2 run consecutively, for a total maximum term of imprisonment of ten (10) years.

If a probationary sentence is imposed, the probation period can be for up to five (5) years. Defendant agrees that the special assessment shall be paid at or before the time of sentencing.

Defendant understands that supervised release is a period of time following imprisonment during which he will be subject to certain restrictive conditions and requirements. Defendant further understands that if supervised release is imposed and he violates one or more of the conditions or requirements, Defendant could be returned to

prison for all or part of the term of supervised release that was originally imposed. This could result in Defendant's serving a total term of imprisonment greater than the statutory maximum stated above.

Defendant understands that as a part of any sentence, in addition to any term of imprisonment and/or fine that is imposed, the Court may order Defendant to pay restitution to any victim of the offense, as required by law.

Defendant agrees that any monetary penalty the Court imposes, including the special assessment, fine, costs, or restitution, is due and payable immediately and further agrees to submit a completed Financial Statement of Debtor form as requested by the United States Attorney's Office.

5. **Rights Waived by Pleading Guilty.** Defendant understands that by pleading guilty, he knowingly and voluntarily waives the following rights:

   a. The right to plead not guilty and to persist in a plea of not guilty;
   b. The right to a speedy and public trial before a jury of his peers;
   c. The right to the effective assistance of counsel at trial, including, if Defendant could not afford an attorney, the right to have the Court appoint one for him;
   d. The right to be presumed innocent until guilt has been established beyond a reasonable doubt at trial;
   e. The right to confront and cross-examine witnesses against Defendant at trial;
   f. The right to compel or subpoena witnesses to appear on his behalf at trial;
   g. The right to testify or to remain silent at trial, at which trial such silence could not be used against Defendant; and
   h. The right to appeal a finding of guilt or any pretrial rulings.

6. **Ultimate Sentence.** Defendant acknowledges that no one has promised or guaranteed what sentence the Court will impose.

7. **Statement of Facts.** Defendant admits he is guilty of the charged offenses. The parties agree on the following facts:

    a. ***Background:*** Between 2011 and August 24, 2015, defendant Lobsang Dargey owned and operated several Washington-based real estate development companies, including Path America LLC, Dargey Development LLC, and Dargey Enterprises LLC.

    b. During this time, defendant Lobsang Dargey also owned and operated Path America SnoCo LLC and Path America KingCo LLC, two EB-5 regional centers approved by the United States Immigration and Citizenship Services ("USCIS"), an agency within the Department of Homeland Security.

    c. Using the two USCIS-approved regional centers, Path America SnoCo LLC and Path America KingCo LLC, defendant Lobsang Dargey promoted two EB-5 projects to immigrant investors, Path America Farmer's Market (the "PAFM Project") and Potala Tower (the "Tower Project"), respectively.

    d. ***Promotion of the EB-5 Investments:*** To promote the PAFM Project and Tower Project to immigrant investors, defendant Lobsang Dargey prepared and caused to be prepared a number of offering materials, including Private Placement Memoranda, Subscription Agreements, Escrow Agreements, Partnership Agreements, and Business Plans for both projects (collectively, the "EB-5 Offering Materials"). Defendant Lobsang Dargey submitted and caused to be submitted the EB-5 Offering Materials to potential immigrant investors in China. The EB-5 Offering Materials represented that: (1) investments in the PAFM Project and Tower Project were suitable for immigrant investors under the EB-5 program; and (2) defendant Lobsang Dargey would manage the offering and construction of the PAFM Project and Tower Project to be compliant with USCIS rules for the EB-5 program.

    e. Defendant Lobsang Dargey knew that the immigrant investors would rely on the representations in the EB-5 Offering Materials in deciding whether to invest in the PAFM Project and the Tower Project. Defendant Lobsang Dargey also knew that the immigrant investors would be required to submit the EB-5 Offering Materials to USCIS in support of the investors' I-526 petitions seeking conditional residence in the United States.

f. The EB-5 Offering Materials represented that defendant Lobsang Dargey would use the immigrant investors' $500,000 investments in the PAFM Project and Tower Project to build the projects in accordance with the Business Plans for each project. In addition, the EB-5 Offering Materials represented that defendant Lobsang Dargey would use the $45,000 administrative fees to pay sales commissions and other offering expenses. The EB-5 Offering Materials also represented that defendant Lobsang Dargey would make millions of dollars of equity contributions to the projects.

g. Despite his representations in the EB-5 Offering Materials, defendant Lobsang Dargey knowingly: (1) failed to contribute any funds to the projects as equity; (2) used portions of the EB-5 investors' $500,000 capital contributions for purposes other than the construction of the PAFM Project and Tower Project; and (3) caused the PAFM Project and Tower Project to depart from the business plans for both projects in numerous material respects without informing the immigrant investors or USCIS. These actions could have rendered each investor ineligible for an EB-5 visa.

h. Specifically, contrary to his representations, defendant Lobsang Dargey used a portion of the immigrant investors' $500,000 capital contributions for the PAFM Project and Tower Project: (1) to pay $11.5 million in commissions and syndication costs related to the offerings; and (2) to divert $16.8 million to other non-EB-5 real estate projects defendant Lobsang Dargey owned and controlled, including his Kirkland, Shoreline, and Othello projects.

i. Between April 2012 and August 24, 2015, defendant Lobsang Dargey knowingly and deliberately filed and caused to be filed with USCIS numerous documents, including the Offering Materials, knowing that the documents contained material misrepresentations and omissions concerning the PAFM and Tower projects. Defendant Lobsang Dargey did so knowing that his conduct was unlawful.

j. **The Voya Loans:** To fund a portion of the PAFM Project, defendant Lobsang Dargey applied for, and obtained, a $25 million construction loan from Voya Insurance and Annuity Company ("Voya"). As part of the loan, Voya required defendant Lobsang Dargey to personally guarantee the loan through construction and stabilization of the project. To verify that defendant Lobsang Dargey had sufficient financial means to satisfy the personal guarantee, Voya required defendant Lobsang Dargey to disclose personal financial information, including concerning his personal liquid assets.

k. To satisfy Voya, defendant Lobsang Dargey submitted a personal financial statement to Voya that represented that a Path America Asia, Ltd. bank account at HSBC in Hong Kong contained over $9.6 million in U.S. dollars. In support of this statement, defendant Lobsang Dargey created and caused to be created a materially false

and fraudulent bank statement for the HSBC account that showed a balance in excess of $9.6 million U.S. dollars when, in fact, the balance was less than $450,000 U.S. dollars. Defendant Lobsang Dargey submitted this fraudulent bank statement to Voya to support his false and fraudulent representations on his personal financial statement.

l.    After obtaining the $25 million loan from Voya, defendant Lobsang Dargey was required to provide quarterly financial statements to Voya. Defendant Lobsang Dargey directed a Path America employee to alter the PAFM LLC balance sheets by removing entries that reflected that millions of dollars had been diverted from the projects. Defendant Lobsang Dargey then directed the employee to affix his signature to the altered financial statements and submit them to Voya.

m.    Defendant Lobsang Dargey also attempted to obtain a $66 million construction loan from Voya for the Tower Project. Again, Voya required that defendant Lobsang Dargey and his wife personally guarantee the loan, and required information concerning defendant Lobsang Dargey's financial condition to ensure he had sufficient liquid assets to fund construction cost overruns and to make payments on the loan. On or about July 27, 2015, defendant Lobsang Dargey sent Voya another materially false and fraudulent Path America Asia, Ltd. HSBC bank statement which defendant Lobsang Dargey had altered or caused to be altered to make it appear that the account balance was approximately $8.2 million U.S. dollars when, in fact, the account balance was less than $400,000 U.S. dollars.

n.    **The Binjiang Investment:** In 2015, defendant Lobsang Dargey solicited and obtained $60 million from a Chinese investment company, Shanghai Binshun Investment Management Company ("Binjiang"), for equity investments in the Tower Project ($30 million) and defendant Lobsang Dargey's Shoreline and Othello projects ($15 million each).

o.    On or about June 4, 2015, prior to Binjiang's funding of the investments, a representative of Deloitte Touche Tomhatsu Ltd. ("Deloitte") in Hong Kong asked defendant Lobsang Dargey to send financial statements for the three projects. At the time, certain entries on the Potala Tower Seattle LLC balance sheet reflected that Potala Tower Seattle LLC was owed $16.8 million from the PAFM Project and defendant Lobsang Dargey's Kirkland, Shoreline, and Othello projects as a result of the defendant Lobsang Dargey's diversions described above (the "due from entries").

p.    On or about June 8th and 9th, 2015, defendant Lobsang Dargey directed other Path America employees to: (1) remove the $16.8 million in due from entries from the Potala Tower Seattle LLC balance sheet and to place them on the balance sheet for Path America Tower LP; and (2) reduce the amount of immigrant

investor funds loaned from Path America Tower LP to Potala Tower Seattle LLC by $16.8 million.

q. As part of its investment into the Tower Project and the Shoreline and Othello projects, Binjiang required defendant Lobsang Dargey to make equity contributions in the amounts of $15 million for the Tower Project and $5 million each for the Shoreline and Othello projects. These obligations were set out in a series of Investment Agreements between Binjiang and business entities controlled by defendant Lobsang Dargey. With respect to the Tower Project, defendant Lobsang Dargey represented to Binjiang that he had already contributed approximately $12 million to purchase the land for the project, and would make an additional $3 million equity contribution. In fact, defendant Lobsang Dargey had purchased the Tower land with seller financing, and subsequently used investor funds to pay for the land. With respect to Othello, defendant Lobsang Dargey represented that he had already contributed $3 million to the project and would make an additional equity contribution of $2 million. With respect to Shoreline, the Shoreline Investment Agreement required defendant Lobsang Dargey to make a total equity contribution of $5 million. Defendant Lobsang Dargey represented that he had already contributed $8.5 million toward the Shoreline project. Accordingly, the Shoreline Investment Agreement stated that defendant Lobsang Dargey had made an "excess" equity contribution of $3.5 million, which would be "refunded" to defendant Lobsang Dargey out of Binjiang's $15 million investment.

r. On or about June 8 and 9, 2015, defendant Lobsang Dargey directed another Path America employee to make a number of journal entries in the accounting records for Potala Tower Seattle LLC, Path Shoreline LLC, Path Othello LLC, and Dargey Development to make it appear that Lobsang Dargey and Dargey Development had incurred millions of dollars of direct overhead expenses on behalf of the projects for which Lobsang Dargey and Dargey Development had not been reimbursed, when in fact, Lobsang Dargey and Dargey Development had not incurred these costs. The effect of these entries was to create the appearance that Potala Tower Seattle LLC owed $3.7 million to Lobsang Dargey, and that Path Shoreline LLC and Path Othello LLC owed Dargey Development $500,000 and $1,500,000, respectively. Defendant Lobsang Dargey then directed the employee to convert these purported obligations into equity credits in favor of Lobsang Dargey and Dargey Development, making it appear that equity contributions in these amounts had been made to the projects. These journal entries lacked economic substance, and neither Dargey Development nor Lobsang Dargey received any real economic benefit from these journal entries.

s. Similarly, defendant Lobsang Dargey also directed the Path America employee to make a number of journal entries in the accounting records for Path Shoreline LLC, Path Othello LLC, and Dargey Development to make it appear that

Dargey Development had earned millions of dollars in developer fees. These entries made it appear as if Path Shoreline LLC and Path Othello LLC owed developer fees to Dargey Development in the amounts of $1,000,000, and $2,500,000, respectively. Defendant Lobsang Dargey then directed the employee to convert these fictitious obligations into equity credits in favor of Dargey Development. As a result of these journal entries, the balance sheets for Path Shoreline LLC and Path Othello LLC reflected that defendant Lobsang Dargey and the entities he controlled had complied with the equity contribution requirements set forth in the Investment Agreements with Binjiang. These journal entries lacked economic substance, and neither Dargey Development nor Lobsang Dargey received any real economic benefit from these journal entries.

t.    ***Overt Acts:*** Lobsang Dargey agreed with other individuals known and unknown to engage in various overt acts in furtherance of the conspiracy to commit wire fraud on the investors and USCIS. As one example, on or about May 13, 2015, defendant Lobsang Dargey caused $6,000,000 derived solely from Potala Tower investors' capital contributions to be used to purchase land for defendant Lobsang Dargey's Shoreline project by means of an interstate and foreign wire transmission.

8.    **United States Sentencing Guidelines**. Defendant understands and acknowledges that the Court must consider the sentencing range calculated under the United States Sentencing Guidelines and possible departures under the Sentencing Guidelines together with the other factors set forth in Title 18, United States Code, Section 3553(a), including: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need for the sentence to afford adequate deterrence to criminal conduct; (5) the need for the sentence to protect the public from further crimes of the defendant; (6) the need to provide the defendant with educational and vocational training, medical care, or other correctional treatment in the most effective manner; (7) the kinds of sentences available; (8) the need to provide restitution to victims; and (9) the need to avoid unwarranted sentence disparity among defendants involved in similar conduct who have similar records. Accordingly, Defendant understands and acknowledges that:

a.  The Court will determine applicable Defendant's Sentencing Guidelines range at the time of sentencing;

b.  After consideration of the Sentencing Guidelines and the factors in 18 U.S.C. 3553(a), the Court may impose any sentence authorized by law, up to the maximum term authorized by law;

c.  The Court is not bound by any recommendation regarding the sentence to be imposed, or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Department, or by any stipulations or agreements between the parties in this Plea Agreement; and

d.  Defendant may not withdraw his guilty plea solely because of the sentence imposed by the Court.

9. **Acceptance of Responsibility.** At sentencing, *if* the district court concludes Defendant qualifies for a downward adjustment for acceptance of responsibility pursuant to USSG § 3E1.1(a) and the defendant's offense level is 16 or greater, the United States will make the motion necessary to permit the district court to decrease the total offense level by three (3) levels pursuant to USSG §§ 3E1.1(a) and (b), because Defendant has assisted the United States by timely notifying the United States of his intention to plead guilty, thereby permitting the United States to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

10. **Sentencing Factors.** The parties agree that the following Sentencing Guidelines provisions apply to this case:

a.  A base offense level of six (6) pursuant to USSG § 2B1.1(a)(2);

b.  A twenty (20) level enhancement pursuant to USSG § 2B1.1(b)(1)(K) based upon a loss for guidelines purpose of more than $9,500,000 but less than $25,000,000. The total loss amount of $24,242,220 reflects $12,690,000 in total administrative fees paid by investors, and an additional $11,552,220 in additional commissions and syndication payments made out of the investors' $500,000 capital contribution.

  c. A two (2) level enhancement pursuant to USSG § 2B1.1(b)(2)(A) because the defendant's offense involved ten (10) or more victims;

  d. A two (2) level enhancement pursuant to USSG § 2B1.1(b)(10)(B) and (C) because: (1) a substantial part of the fraudulent scheme was committed from outside the United States; and (2) the offense otherwise involved sophisticated means and the defendant intentionally engaged in the conduct constituting sophisticated means;

  e. A four (4) level enhancement pursuant to USSG § 3B1.1(a) because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive; and

  f. A two (2) level enhancement pursuant to USSG § 3B1.3 because the defendant abused a position of private trust in a manner that significantly facilitated the commission of the offense.

The parties agree that, with the exception of acceptance of responsibility referenced in paragraph 9, no other Sentencing Guidelines adjustments or enhancements are appropriate or readily provable. Defendant understands that at the time of sentencing, the Court is free to reject these stipulated adjustments, and is further free to apply additional downward or upward adjustments in determining Defendant's Sentencing Guidelines range.

11. **Restitution.** Defendant shall make restitution to the victims of his offense in the amount of $24,242,220. This amount, which reflects the loss to the victims of Defendant's conduct, includes $11,552,220 in unauthorized commission payments and syndication costs and $12,690,000 in administrative fees paid by the immigrant investors. Thirty-five (35) of the Tower investors were previously refunded the full amount of their capital contribution, and therefore, are entitled to $45,000 each representing their administrative fees. The remaining 247 investors shall each be entitled to receive total restitution of $91,770, which consists of (a) $46,770 for commissions and syndication costs, and (b) $45,000 for administrative fees. This amount shall be due and payable immediately and shall be paid in accordance with a schedule of payments as proposed by the United States Probation Office and ordered by the Court.

In the event that any investor is repaid an amount greater than $453,230 of the principal amount of his or her capital contribution through returns on the investment or money distributed by the Receiver, the $46,770 portion of the restitution obligation to that investor will be reduced by the amount he or she received in excess of $453,230, such that an investor who is repaid his or her full $500,000 capital contribution shall not be entitled to any restitution for commissions and syndication costs. In addition, to the extent any portion of the $45,000 administrative fee is returned to any investor, the $45,000 portion of the restitution obligation for that investor will be reduced accordingly. In light of Defendant's restitution obligation, the United States agrees to recommend that no fine be imposed.

12. **Non-Prosecution of Additional Offenses**. As part of this Plea Agreement, the United States Attorney's Office for the Western District of Washington agrees not to prosecute Defendant for any additional offenses known to it as of the time of this Agreement that are based upon evidence in its possession at this time, and that arise out of the conduct giving rise to this investigation. In this regard, Defendant recognizes the United States has agreed not to prosecute all of the criminal charges the evidence establishes were committed by Defendant solely because of the promises made by Defendant in this Agreement. Defendant agrees, however, that for purposes of preparing the Presentence Report, the United States Attorney's Office will provide the United States Probation Office with evidence of all conduct committed by Defendant.

Defendant agrees that any charges to be dismissed before or at the time of sentencing were substantially justified in light of the evidence available to the United States, were not vexatious, frivolous or taken in bad faith, and do not provide Defendant with a basis for any future claims under the "Hyde Amendment," Pub.L. No. 105-119 (1997).

13. **Breach, Waiver, and Post-Plea Conduct**. Defendant agrees that if Defendant breaches this Plea Agreement, the United States may withdraw from this Plea

Agreement and Defendant may be prosecuted for all offenses for which the United States has evidence. Defendant agrees that, in the event Defendant breaches this Plea Agreement, Defendant will not oppose any steps taken by the United States to nullify this Plea Agreement, including the filing of a motion to withdraw from the Plea Agreement. Defendant also agrees that if Defendant is in breach of this Plea Agreement, Defendant has waived any objection to the re-institution of any charges in the Indictment that were previously dismissed or any additional charges that had not been prosecuted.

Defendant further understands that if, after the date of this Agreement, Defendant should engage in illegal conduct, or conduct that violates any conditions of release or the conditions of his confinement, (examples of which include, but are not limited to, obstruction of justice, failure to appear for a court proceeding, criminal conduct while pending sentencing, and false statements to law enforcement agents, the Pretrial Services Officer, Probation Officer, or Court), the United States is free under this Plea Agreement to file additional charges against Defendant or to seek a sentence that takes such conduct into consideration by requesting the Court to apply additional adjustments or enhancements in its Sentencing Guidelines calculations in order to increase the applicable advisory Guidelines range, and/or by seeking an upward departure or variance from the calculated advisory Guidelines range. Under these circumstances, the United States is free to seek such adjustments, enhancements, departures, and/or variances even if otherwise precluded by the terms of the plea agreement.

14. **Waiver of Appellate Rights and Rights to Collateral Attacks.**

Defendant acknowledges that by entering the guilty plea required by this plea agreement, Defendant waives all rights to appeal from his conviction and any pretrial rulings of the court. Defendant further agrees that, provided the court imposes a custodial sentence that is within or below the Sentencing Guidelines range (or the statutory mandatory minimum, if greater than the Guidelines range) as determined by the court at the time of sentencing, Defendant waives to the full extent of the law:

a. Any right conferred by Title 18, United States Code, Section 3742, to challenge, on direct appeal, the sentence imposed by the court, including any fine, restitution order, probation or supervised release conditions, or forfeiture order (if applicable); and

b. Any right to bring a collateral attack against the conviction and sentence, including any restitution order imposed, except as it may relate to the effectiveness of legal representation; and

This waiver does not preclude Defendant from bringing an appropriate motion pursuant to 28 U.S.C. § 2241, to address the conditions of his confinement or the decisions of the Bureau of Prisons regarding the execution of his sentence.

If Defendant breaches this Plea Agreement at any time by appealing or collaterally attacking (except as to effectiveness of legal representation) the conviction or sentence in any way, the United States may prosecute Defendant for any counts, including those with mandatory minimum sentences, that were dismissed or not charged pursuant to this Plea Agreement.

15. **Voluntariness of Plea.** Defendant agrees that he has entered into this Plea Agreement freely and voluntarily and that no threats or promises, other than the promises contained in this Plea Agreement, were made to induce Defendant to enter his plea of guilty.

16. **Statute of Limitations.** In the event this Agreement is not accepted by the Court for any reason, or Defendant has breached any of the terms of this Plea Agreement, the statute of limitations shall be deemed to have been tolled from the date of the Plea Agreement to: (1) thirty (30) days following the date of non-acceptance of the Plea Agreement by the Court; or (2) thirty (30) days following the date on which a breach of the Plea Agreement by Defendant is discovered by the United States Attorney's Office.

17. **Completeness of Agreement.** The United States and Defendant acknowledge that these terms constitute the entire Plea Agreement between the parties. This Agreement binds only the United States Attorney's Office for the Western District of Washington. It does not bind any other United States Attorney's Office or any other office or agency of the United States, or any state or local prosecutor.

Dated: January 4, 2017.

LOBSANG DARGEY
Defendant

ROBERT MAHLER
Attorney for Defendant

JUSTIN W. ARNOLD
Assistant United States Attorney

SETH WILKINSON
Assistant United States Attorney